PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3792
_____

SANDRA CONNELLY,
                                    Appellant

v.

LANE CONSTRUCTION CORPORATION

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:13-cv-1402)
District Judge:  Honorable Terrence F. McVerry
_____

Argued on September 15, 2015

Before:   FISHER, CHAGARES, and JORDAN, *Circuit
Judges*.

(Filed: January 11, 2016)
_____

John E. Stember, Esq.
Emily E. Town, Esq.   [ARGUED]
Stember Cohn & Davidson-Welling, LLC
425 First Avenue, 7th Floor
The Harley Rose Building
Pittsburgh, PA  15219
        *Counsel for Appellant*

Samantha M. Clancy, Esq.   [ARGUED]
Maria Greco Danaher, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One PPG Place, Suite 1900
Pittsburgh, PA  15222
        *Counsel for Appellee*

Christine J. Back, Esq.   [ARGUED]
Equal Employment Opportunity Commission
131 M Street, N.E. – 5th Fl.
Washington, DC   20507
        *Counsel for Amicus Appellant*

_____

OPINION
_____

JORDAN, *Circuit Judge*.

Sandra Connelly appeals the dismissal of the employment discrimination claims she brought against her former employer, Lane Construction Corporation ("Lane"). We disagree with the District Court's assessment that Connelly failed to plead plausible claims and, accordingly,

will vacate the order of dismissal and remand for further proceedings.

## I.   BACKGROUND

### A.   *Factual History*[1]

Lane is a construction company operating in 20 states. In May 2006, it hired Sandra Connelly as a union truck driver at its Pittsburgh, Pennsylvania facility, and she worked during construction seasons – normally from March or April until October or November of each year – until near the close of the season in October 2010. During Connelly's tenure with the company, Lane employed seven union truck drivers at that location. Connelly ranked fifth in seniority and was the only woman. Since October 2010, Lane has employed no female truck drivers at its Pittsburgh facility.

Sometime after May 2007, and allegedly because Connelly had ended a romance with a man who also worked at Lane, her male co-workers began "curs[ing] at Connelly and belittl[ing] her on a daily basis." (App. 29.) Some male drivers refused to speak directly to her. In the summer of 2007, another Lane employee told Connelly that Connelly's former boyfriend, truck driver Mark Nogy, was making "increasingly frequent and disparaging" comments about her. (App. 29.) The employee went on to say that he had

---

[1] Because the District Court addressed Connelly's Amended Complaint upon a motion to dismiss, we recount the facts as alleged in that pleading and draw all reasonable inferences in favor of Connelly. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

complained about Nogy's behavior to Charlie Ames, a Lane executive. Connelly herself told several supervisors at Lane about the hostile treatment she was experiencing. She called the company's Connecticut headquarters and, a day later, Ames and another Lane executive met with her to discuss the harassment problem. Following the meeting, Lane suspended Nogy for three days but did not discipline or warn any other Lane employees, who continued to harass and disparage Connelly.

In early 2009, Connelly learned that Lane employees could make job-related complaints through the company's "Ethics Line," which she called multiple times to report further harassment from Nogy, to make complaints about her male co-workers drinking on the job, and to report "discriminatory treatment due to her gender and her previous complaints about the hostile work environment." (App. 31.)

In or around May 2010, Lane foreman George Manning made an unwanted physical advance to Connelly, coming close to her and saying, "[O]ne day I'm going to kiss you." (App. 31.) Connelly backed away and said "No," and she reported the incident to the Ethics Line a few days later. (App. 31.) She also reported the incident to supervisor Jeremy Hostetler, requesting that he transfer her to another work site because she was now uncomfortable working with Manning. Hostetler expressed disbelief that Manning would "do something like that." (App. 32.) Although Hostetler told Connelly that he wanted to meet with her and Manning together, no such meeting occurred. After Connelly again called the Ethics Line about the situation, Hostetler agreed to transfer her to another job site, although it appears that Connelly continued to work from Lane's Pittsburgh facility.

4

Connelly's relationship with both her supervisors and her male co-workers became "increasingly strained" throughout 2010, during which time she made numerous complaints to the Ethics Line and to local management at the Pittsburgh facility. (App. 32.)

In October 2010, Lane supervisor Jerry Schmittein became "incensed" at Connelly when she refused to drive a truck that had a flat tire and steering problems. (App. 32.) Schmittein "persisted in berating Connelly," despite her explanation that she could not safely operate the truck. (App. 32.) Connelly contacted Ames, who instructed her to leave the job site. A short time later, and despite her seniority, Connelly was laid off before the end of the construction season and before any of the other union truck drivers. Lane has never recalled her to work.

Lane did, however, recall Connelly's male truck driver co-workers in 2011, and it continues to employ them. In April or May of 2011, after Connelly saw several of her co-workers working at a job site, she repeatedly telephoned Ames to ask why she had not been recalled. Ames cited the bad economy and told her that no work was available. In one conversation, Ames told her that he would recall her if Lane "got more work." (App. 33.)

Connelly had observed that all six of her male truck driver co-workers were working for Lane, so she called Ames and asked why union drivers with less seniority than her had been recalled before she was. In Connelly's experience, between 2006 and 2010, Lane had always recalled truck drivers in order of seniority. Ames told Connelly that the truck driver with the least seniority had been permitted to

5

return to work as a general laborer because "he needed to work." (App. 33.) Lane had not offered any such accommodation to Connelly. Ames also explained that the other driver with less seniority than Connelly had been recalled to operate what was known as the "tack" truck because Connelly did not have the requisite training to operate that type of vehicle. (App. 33.) Connelly asked why the most senior driver, who was the primary tack truck operator, was no longer driving that truck. Ames answered that that driver was the "senior man – he can choose what he drives." (App. 33.) However, Lane had not previously permitted truck drivers to choose their work assignment based on seniority, and the union's collective bargaining agreement provided that "[d]rivers in accordance with their qualifications and seniority shall be offered the highest rate classification of work but cannot choose their equipment or work assignments." (App. 33.) Connelly was qualified to operate – and routinely had operated – all of the trucks used by Lane other than the tack truck.

Connelly also observed non-union truck drivers working at Lane sites in the spring and summer of 2011. In addition, she saw Lane employing rental trucks from other companies and using Lane laborers to drive trucks. Prior to 2011, Lane had only resorted to that when no Lane drivers were available, and never when a Lane driver was waiting to be recalled.

### B. *Procedural History*

On September 26, 2013, Connelly filed her original complaint in the United States District Court for the Western District of Pennsylvania, alleging claims of gender-based

disparate treatment, sexual harassment, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"), and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA"). Lane responded by filing an answer along with a motion to partially dismiss the complaint. The Court dismissed as time-barred all but the retaliation claim, which related to Lane's failure to rehire Connelly in April 2011, but granted Connelly's request to file an amended complaint.

Connelly then filed her Amended Complaint, alleging separate counts of disparate treatment and retaliation under both Title VII and the PHRA. Lane promptly moved to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) and, after briefing, the District Court granted that motion. The Court held that, with respect to her disparate treatment claims, Connelly had "failed to plead a sufficiently plausible inference that she was not rehired due to her gender." (App. 12.) Similarly, the Court held that the Amended Complaint failed to allege sufficient facts to establish a plausible claim of retaliation. It also denied Connelly's request to file a second amended complaint. The District Court thus dismissed all of Connelly's claims with prejudice. She timely appealed.

## II.    DISCUSSION[2]

---

[2] The District Court had jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367. We have appellate jurisdiction over the final decision of the District Court pursuant to 28 U.S.C. § 1291. We

7

Connelly asserts two claims of error. First, she says that the District Court erred in holding that her Amended Complaint failed to meet the plausibility standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Second, she argues that the District Court should have granted her leave to further amend the Amended Complaint. Because we agree with her on the first point, we need not reach the second.[3]

    A.       *Standards for Pleading Sufficiency*

---

review the District Court's decision to grant a motion to dismiss under a plenary standard. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009). We are "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014) (quotation marks and citations omitted). However, as more fully described herein, we disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements. *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010).

[3] Connelly only sought a curative amendment if the District Court decided to dismiss the Amended Complaint under Rule 12(b)(6). In that event, she asked for leave to "bolster the factual allegations related to her retaliation and disparate treatment claims." (App. 14.) Because we conclude that Connelly's pleadings were sufficient to survive the motion to dismiss, no curative amendment is necessary.

8

A complaint may be dismissed under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." But detailed pleading is not generally required. The Rules demand "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). Although the plausibility standard "does not impose a probability requirement," *Twombly*, 550 U.S. at 556, it does require a pleading to show "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678. A complaint that pleads facts "merely consistent with a defendant's liability … stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation and internal quotation marks omitted). The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps.[4] First, it must "tak[e] note of the

---

[4] Although *Ashcroft v. Iqbal* described the process as a

9

elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. *See also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

### B.     The Elements Necessary to State a Claim

We thus begin by taking note of the elements Connelly must plead to state her claims. With respect to her disparate treatment claim, Title VII makes it an "unlawful employment practice for an employer … to discriminate against any individual …, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). *See also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92-93 (2003). In 1991, Congress amended Title VII to further specify that, "[e]xcept as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for

"two-pronged approach," 556 U.S. 662, 679 (2009), the Supreme Court noted the elements of the pertinent claim before proceeding with that approach, *id*. at 675-79. Thus, we have described the process as a three-step approach. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 n.4 (3d Cir. 2011) (citing *Santiago*, 629 F.3d at 130).

10

any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). In *Watson v. Southeastern Pennsylvania Transportation Authority*, we interpreted that amendment to apply only to the category of discrimination cases that involve a "mixed-motive." 207 F.3d 207, 214-20 (3d Cir. 2000). Generally speaking, in a "mixed-motive" case a plaintiff claims that an employment decision was based on both legitimate and illegitimate reasons. Such cases are in contrast to so-called "pretext" cases, in which a plaintiff claims that an employer's stated justification for an employment decision is false.

A Title VII plaintiff may make a claim for discrimination "under either the pretext theory set forth in *McDonnell Douglas Corp. v. Green*[, 411 U.S. 792, (1973)], or the mixed-motive theory set forth in *Price Waterhouse v. Hopkins*[, 490 U.S. 228 (1989)], under which a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons."[5] *Makky v. Chertoff*, 541

---

[5] An employee proceeding under the *McDonnell Douglas* pretext framework bears the initial burden of establishing a *prima facie* case by showing: (1) that she was a member of a protected class, (2) that she was qualified for the job, and (3) another person, not in the protected class, was treated more favorably. *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006). If the employee establishes a *prima facie* case, the burden shifts to the employer to establish a legitimate nondiscriminatory reason for its employment action. *Id.* If the employer provides such a reason, the burden shifts back to the employee to show that the proffered reason was mere pretext for actual discrimination. *Id.* Notwithstanding this

11

F.3d 205, 213 (3d Cir. 2008).  As we recognized in *Watson*, the "pretext" and "mixed-motive" labels can be misleading because, even in a case that does not qualify for a burden-shifting instruction under *Price Waterhouse*, the employer's challenged conduct may nevertheless result from two or more motives, and the plaintiff "need not necessarily show 'pretext' but may prevail simply by showing, through direct or circumstantial evidence, that the challenged action resulted from discrimination."  207 F.3d at 214 n.5 (3d Cir. 2000) (citations omitted).  Under either theory of discrimination, the plaintiff must establish that her protected status was a factor in the employer's challenged action.  The difference is in the

---

burden-shifting framework, a plaintiff who produces "direct evidence" of discrimination may proceed under the mixed-motive framework of *Price Waterhouse v. Hopkins.*  490 U.S. 228, 276 (1989) (O'Connor, J., concurring).  As we explained in *Armbruster v. Unisys Corp.*:

> [I]n the *Price Waterhouse* framework … the evidence the plaintiff produces is so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production.  Both the burden of production and the risk of non-persuasion are shifted to the defendant who … must persuade the factfinder that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus.

32 F.3d 768, 778 (3d Cir. 1994).

12

degree of causation that must be shown: in a "mixed-motive" case, the plaintiff must ultimately prove that her protected status was a "motivating" factor, whereas in a non-mixed-motive or "pretext" case, the plaintiff must ultimately prove that her status was a "determinative" factor. *See id*. at 214-20 (summarizing the distinction in standards of causation that apply to "pretext" and "mixed-motive" cases and concluding that the 1991 amendment to Title VII did not alter that distinction).

Connelly's Amended Complaint does not specify whether she intends to proceed under a "mixed-motive" or a "pretext" theory, and understandably so. The distinction between those two types of cases "lies in the kind of proof the employee produces on the issue of [the employer's] bias," *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097 (3d Cir. 1995), and identifying the proof before there has been discovery would seem to put the cart before the horse. Indeed, we have said that, even at trial, an employee "may present his case under both theories," provided that, prior to instructing the jury, the judge decides whether one or both theories applies. *Id*. at 1098 (internal citation omitted); *see also Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir. 1993) (stating that "[w]hether a case is a pretext case or a mixed-motives case is a question for the court once all the evidence has been received"). Thus, for purposes of noting the elements Connelly must plead to state a disparate treatment claim, we take it as given that she may advance either a mixed-motive or a pretext theory.

The District Court, however, incorrectly evaluated the Amended Complaint as if Connelly were confined to showing pretext. Moreover, the Court's analysis proceeded with a

13

point-by-point consideration of the elements of a *prima facie* case required under a pretext theory. It is thus worth reiterating that, at least for purposes of pleading sufficiency, a complaint need not establish a *prima facie* case in order to survive a motion to dismiss.[6] A *prima facie* case is "an evidentiary standard, not a pleading requirement," *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002), and hence is "not a proper measure of whether a complaint fails to state a claim." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009). As we have previously noted about pleading in a context such as this,

> [a] determination whether a *prima facie* case has been made … is an evidentiary inquiry – it defines the quantum of proof [a] plaintiff must present to create a rebuttable presumption of discrimination. Even post-*Twombly*, it has been

---

[6] In *Makky v. Chertoff*, we held that the plaintiff could not avoid dismissal of his mixed-motive discrimination claim if there was "unchallenged objective evidence" that he did not possess the "baseline qualifications" to do his job, because such a plaintiff would inevitably fail to establish a *prima facie* case of employment discrimination after the pleading stage. 541 F.3d 205, 215 (3d Cir. 2008). However, our analysis explicitly assumed the sufficiency of the plaintiff's pleadings, *id.* at 214, and we limited our "necessarily narrow" holding to those rare mixed-motive cases in which the plaintiff's lack of baseline qualifications is "capable of objective determination before discovery," as when the job requires consideration of a license or similar prerequisite, *id.* at 215. Thus, that opinion expressly recognized that the *prima facie* case is a separate inquiry that generally cannot occur until after discovery.

noted that a plaintiff is not required to establish the elements of a *prima facie* case … .

*Id*. at 213 (citation omitted). Instead of requiring a *prima facie* case, the post-*Twombly* pleading standard "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

Should her case progress beyond discovery, Connelly could ultimately prevail on her disparate treatment claim by proving that her status as a woman was either a "motivating" or "determinative" factor in Lane's adverse employment action against her. Therefore, at this early stage of the proceedings, it is enough for Connelly to allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims.

For the same reasons, Connelly's retaliation claim may survive Lane's motion to dismiss if she pleads sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence of the following elements: (1) she engaged in conduct protected by Title VII; (2) the employer took adverse action against her; and (3) a causal link exists between her protected conduct and the employer's adverse action. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir. 1994).

## C.     *Excluding Conclusory Allegations*

At the second step in our pleading analysis, we identify those allegations that, being merely conclusory, are

15

not entitled to the presumption of truth. *Twombly* and *Iqbal* distinguish between legal conclusions, which are discounted in the analysis, and allegations of historical fact, which are assumed to be true even if "unrealistic or nonsensical," "chimerical," or "extravagantly fanciful." *Iqbal*, 556 U.S. at 681. Put another way, *Twombly* and *Iqbal* expressly declined to exclude even outlandish allegations from a presumption of truth except to the extent they resembled a "formulaic recitation of the elements of a … claim" or other legal conclusion.[7] *Id.* (internal quotation marks omitted); *see also Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 827 (7th Cir. 2015) (concluding that allegations that were "neither legal assertions nor conclusory statements reciting the elements of a cause of action" were "entitled to a presumption of truth" under *Iqbal*). Perhaps "some allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual," but the clearest indication that an allegation is conclusory and unworthy of weight in analyzing the sufficiency of a complaint is that it embodies a legal point. *Peñalbert-Rosa v. Fortuño-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) (citation and internal quotation marks omitted).

---

[7] The Court in *Iqbal* clarified that it was only the conclusory nature of certain allegations – that is, their mere recitation of formulaic legal elements – that rendered them excludable: "[W]e do not reject these bald allegations on the ground that they are unrealistic or nonsensical. … It is the conclusory nature of [the] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Iqbal*, 556 U.S. at 681.

16

Although the District Court considered the Amended Complaint to be "extremely vague and conclusory," it did not specifically identify any allegations that, being mere legal conclusions, should have been discounted. (App. 10.) In our plenary review of the motion to dismiss, we consider the following allegations in the Amended Complaint to be disentitled to any presumption of truth: (1) that Connelly's supervisors at Lane "subjected her to disparate treatment based on her gender and retaliation for making complaints about discrimination and sexual harassment" (App. 26); (2) that Lane, "[b]y subjecting Connelly to discrimination based on her gender and retaliation," violated Title VII and the PHRA (App. 26-27); (3) that Connelly was an "employee" of Lane "within the meaning of Title VII and the PHRA" (App. 27); (4) that "[a]t all times relevant to this case, [Lane] was an 'employer' within the meaning of Title VII and the PHRA" (App. 27); and (5) that "Connelly has exhausted her federal and state administrative remedies." (App. 36). All of these allegations paraphrase in one way or another the pertinent statutory language or elements of the claims in question. To the extent that Connelly's allegation that she "was sexually harassed" by Manning states a legal conclusion, that is also excluded, although her factual allegations describing Manning's behavior and her reaction to him, along with her allegation that his threatened physical contact was "unwanted," are accepted as true. (App. 31.)

### D. Construing the Historical Facts in the Plaintiff's Favor

Even after *Twombly* and *Iqbal*, a complaint's allegations of historical fact continue to enjoy a highly favorable standard of review at the motion-to-dismiss stage of

17

proceedings. *See Phillips*, 515 F.3d at 231 (noting that *Twombly* "leaves intact" the pleading standard under which "detailed factual allegations" are not required). Although a reviewing court now affirmatively disregards a pleading's legal conclusions, it must still – as we have already emphasized – assume all remaining factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014); *see also Phillips*, 515 F.3d at 231 (holding that *Twombly* did not "undermine [the] principle" that all reasonable inferences are to be drawn in favor of the plaintiff, and reaffirming that "the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits").

### 1. *The Disparate Treatment Claim*

With respect to Connelly's disparate treatment claim,[8] the Amended Complaint set forth sufficient factual allegations to raise a reasonable expectation that discovery would reveal evidence that Connelly was a member of a

---

[8] While Connelly advances a disparate treatment claim under both Title VII and the PHRA, we refer to those claims in the singular, as they are governed by essentially the same legal standards. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 n.3 (3d Cir. 2000) ("The analysis required for adjudicating [plaintiff's discrimination] claim under PHRA is identical to a Title VII inquiry, and we therefore do not need to separately address her claim under the PHRA.") (internal citation omitted).

protected class and that she suffered an adverse employment action when Lane did not rehire her in 2011. More specifically, Connelly has alleged that (i) during her tenure at Lane, she was the only female truck driver at the Pittsburgh facility; (ii) she was qualified to drive all but one of Lane's trucks; (iii) Lane failed to rehire her at the start of the 2011 construction season, despite recalling the six other union truck-drivers – all male, and two with less union seniority than Connelly; and (iv) since failing to rehire Connelly, Lane has employed no other female truck drivers. Once accepted as true and construed in the light most favorable to the plaintiff, those allegations raise a reasonable expectation that discovery will reveal evidence that Connelly's protected status as a woman played either a motivating or determinative factor in Lane's decision not to rehire her. That is enough for Connelly's disparate treatment claim to survive a motion to dismiss. *Cf. Fowler*, 578 F.3d at 211-12 ("Although [the] complaint is not as rich with detail as some might prefer, it need only set forth sufficient facts to support plausible claims.").

Connelly has also alleged that Lane apparently deviated from its own past hiring norms and work assignments during the 2011 construction season by employing rental trucks and allowing a less senior driver to operate the tack truck. Once accepted as true and construed in the light most favorable to Connelly, those factual allegations would also permit the reasonable inference that Lane's proffered explanation that it failed to rehire Connelly for lack of work was pretextual. But, to be clear, at this stage Connelly is not obliged to choose whether she is proceeding under a mixed-motive or pretext theory, nor is she required to establish a *prima facie* case, much less to engage in the sort of

19

burden-shifting rebuttal that *McDonnell Douglas* requires at a later stage in the proceedings. It suffices for her to plead facts that, construed in her favor, state a claim of discrimination that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). She has done that.

### 2. The Retaliation Claim

Turning to the elements of Connelly's retaliation claim, the facts alleged in the Amended Complaint, taken as true, also raise a reasonable expectation that discovery will reveal evidence both that Connelly engaged in activity protected by Title VII and that Lane took an adverse employment action against her.[9] To the latter point, Lane took an adverse employment action against Connelly when it failed to rehire her at the start of the 2011 construction season. To the former, Connelly engaged in protected activity when she filed multiple complaints of sexual harassment – including and most obviously her May 2010 complaint that Manning, a company foreman, had made unwanted physical advances toward her.[10]

---

[9] Again, although Connelly's retaliation claims are advanced under both Title VII and the PHRA, we refer to those claims in the singular because the same framework for analyzing retaliation claims applies to both. *Cf. Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) ("[W]e analyze ADA retaliation claims under the same framework we employ for retaliation claims arising under Title VII.").

[10] To be protected from retaliation under Title VII, the protected activity must relate to employment discrimination charges brought under that statute, implicating "discrimination on the basis of race, color, religion, sex, or

The District Court held that Connelly's retaliation claim came short of plausibility by "fail[ing] to plead a causal connection between the failure to rehire Connelly in April 2011 and her alleged protected activity." (App. 13.) In pertinent part, the District Court concluded that there was "no temporal proximity (as pled, her last report of sexual harassment was in May 2010, almost a year prior to the failure to rehire her), and no pattern of antagonism by Lane management." (App. 13.)

Given the seasonal character of Connelly's work, we question the District Court's conclusion about temporal proximity. Because Lane only hired Connelly during construction seasons, traditionally laying workers off in October or November and then rehiring them in March or April of the following year, it may be that a retaliatory decision to not rehire her would not become apparent until after the off-season that ran from October 2010 to March 2011.[11]

national origin." *Slagle v. Cty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006). For that reason, we agree with the District Court that Connelly's other complaints, to the extent they implicated only safety issues, were not protected activity for purposes of her retaliation claim.

[11] As we have already stated, no showing of proof is necessary at this stage of the proceedings, but even if the record ultimately produced no evidence of temporal proximity suggestive of retaliation, that would not necessarily be fatal to Connelly's claim. *See Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993) ("The mere passage of time is not legally conclusive proof against retaliation.");

21

In any case, the question of temporal proximity does not render Connelly's retaliation claim facially implausible. Connelly alleged that, after she complained of Manning's unwanted advances, and after overcoming another supervisor's resistance to her grievance by complaining

---

*Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn.").

> Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence, such as *inconsistent reasons given by the employer* for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole.

*Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (citations omitted and emphasis added). Even at this stage, if one accepts as true all of Connelly's factual allegations about her union seniority, Lane's past hiring practices, the company's traditional distribution of labor, and her personal observations of Lane's 2011 workforce, one could reasonably draw the inference that Lane gave Connelly inconsistent and false reasons for declining to rehire her.

directly to the Ethics Line, her relationship with both her supervisors and male co-workers became "increasingly strained" throughout the year. (App. 32.) Thus, Connelly has alleged facts that could support a reasonable inference of a causal connection between her protected activity in May 2010 and the gradual deterioration of her relationship with her employer until she was laid off in October 2010.

In finding no causal connection between Connelly's protected acts and Lane's failure to rehire her in 2011, the District Court noted that Lane continued to rehire Connelly for four consecutive years despite her many complaints, and even encouraged her to continue calling the Ethics Line. While we agree that those facts could be viewed as cutting against Connelly, that is not what the applicable standard of review allows at this point in the case. We must adhere to the requirement that all alleged facts be construed in the light most favorable to the plaintiff, which, if done, permits the view that gender discrimination was a motivating factor or determinative factor in the decision not to recall Connelly in 2011. Likewise, the fact that Lane continued to rehire Connelly for four years despite her complaints about co-workers, but declined to rehire her at the first such opportunity after she complained of harassment by a supervisor, can be construed to support a reasonable inference of a causal connection between the protected act and the adverse employment action.

Therefore, even if one believed it "unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits," *Phillips*, 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 563 n.8), it must still be said that Connelly – under a favorable standard of review – has raised a reasonable

inference that discovery will reveal evidence of the elements necessary to establish her claims.

### III.    CONCLUSION

Because Connelly has alleged facially plausible claims sufficient to survive a motion to dismiss, we will vacate the District Court's Order dismissing the Amended Complaint and remand for further proceedings consistent with this opinion.