NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2325
_____

MICHAEL LASCHE; JENNIFER LASCHE,
Appellants

v.

STATE OF NEW JERSEY; DIVISION OF CHILD PROTECTION AND
PERMANENCY; KYLE HIGGINS; KATIE EPPERLY, PERSONALLY AND IN HER
OFFICIAL CAPACITY; MARY LIPPENCOT, PERSONALLY AND IN HER
OFFICIAL CAPACITY; JANELLE CLARK; JOHN OR JANE DOES 1-10

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 3-18-cv-17552)
District Judge:  Hon. Freda L. Wolfson
_____

Argued on June 2, 2021
_____

Before: HARDIMAN, PHIPPS, COWEN, *Circuit Judges*.

(Opinion filed: March 1, 2022)
_____

Michael P. Laffey    [**ARGUED**]
2nd Floor
222 Highway 35
Red Bank, NJ 07733

*Counsel for Appellants*

Robert J. McGuire  **[ARGUED]**
Office of Attorney General of New Jersey
Division of Law
25 Market Street
Hughes Justice Complex
Trenton, NJ 08625

       *Counsel for Appellees*

———————

OPINION[*]

———————

PHIPPS, *Circuit Judge*.

Two foster parents with religious views against same-sex marriage and homosexual conduct had their foster child removed and their foster license suspended. The foster parents claim that a New Jersey state agency took those actions based on their religious beliefs. On that premise, the foster parents sued the state agency and four of its employees on multiple grounds, including claims under two federal civil rights statutes, 42 U.S.C. § 1983 and § 1985(3), and also under New Jersey's Law Against Discrimination, *see* N.J. Stat. Ann. § 10:5-13(a)(2). After two rounds of motions to dismiss, the District Court dismissed the original complaint and the amended complaint for failure to state a claim for relief. *See* Fed. R. Civ. P. 12(b)(6).

In this appeal, the foster parents challenge the orders dismissing their claims against four employees of the state agency in their individual capacities. On *de novo*

———————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

review, *see St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 299 (3d Cir. 2020), we will affirm those orders in part, vacate them in part, and remand the case.

## I. Factual Background (Based on Allegations in the Complaint)

A Christian couple in New Jersey, Michael and Jennifer Lasche, have "traditional values and beliefs about family, marriage and sex." Am. Compl. ¶ 1 (App. 107). For over ten years, they served as foster parents.

In September 2017, the Monmouth County Office of the New Jersey Division of Child Placement and Permanency ('DCPP') contacted the Lasches about fostering two children. The children were sisters, one was thirteen ('Foster Child 1') and the other was ten ('Foster Child 2'). They also had three younger siblings who were placed in foster care. After speaking with a DCPP caseworker, Kyle Higgins, and her supervisor, Katie Epperly, the Lasches agreed to foster the two girls. By November 2017, the girls' biological parents no longer retained any parental rights, and in October and December the Lasches heard from the caseworker, Higgins, that they were under consideration to adopt the girls.

But three weeks after informing the Lasches that they might be able to adopt the children, Higgins told the Lasches that a couple in Illinois was interested in adopting all five siblings. The Lasches inquired about the prospective adoptive family, and both Higgins and her supervisor, Epperly, stated that they did not know the answers to those questions. Later, in discussing the putative adoption with the foster parents for the other siblings, the Lasches learned that the Illinois couple was "two wealthy gay men with lots

3

of family around to support them and the adoption." Am. Compl. ¶ 14 (App. 109).  A few days later, Higgins came to the Lasches' home and questioned Foster Child 1 about whether she would change her religious beliefs about homosexual conduct – which she held before meeting the Lasches – if she were placed with another family.  About four months later, for reasons that remain confidential, the Lasches and DCPP agreed that Foster Child 2 should be removed from the Lasches' home.

During that time and for two months afterwards, the prospective adoption of all five siblings by the Illinois couple remained under consideration.  In a meeting with Higgins and the therapist for Foster Child 1 in May 2018, Jennifer Lasche stated that she did not oppose allowing Foster Child 1 to spend time with her siblings to see if she wanted to be adopted with them.  At that meeting, Jennifer Lasche also received an update on the adoption process.  Higgins explained that DCPP would present two placement options at an upcoming court hearing, and DCPP would not take a position on either.  The first option was for the children to be adopted by their current foster families; the second was for the Illinois couple to adopt all five children.

The hearing on June 4, 2018, was eventful.  The Illinois couple no longer had an interest in adopting any of the five siblings.  And the judge indicated that the children needed psychiatric evaluations moving forward.

After that hearing, inquiries about the Lasches' religious beliefs intensified.  Later that month, Foster Child 1 came home from a therapy session visibly upset because the therapist repeatedly brought up religion and told her not to feel pressured to follow the Lasches' religious beliefs.  When Jennifer Lasche confronted the therapist, the therapist

4

relayed that she and Higgins had previously discussed the Lasches' "ideas about same-sex couples." Am. Compl. ¶ 23 (App. 111). Later, after picking up Foster Child 1 for her sibling visit, Higgins and an unnamed woman stopped at a Dunkin' Donuts where they questioned Foster Child 1 about her religious beliefs. Although Higgins told Foster Child 1 that the Lasches could not "meet her needs," Am. Compl. ¶ 26 (App. 112), that did not dissuade Foster Child 1 from wanting to remain with the Lasches.

Around that same time, Higgins called Jennifer Lasche to discuss transitioning Foster Child 1 to her foster brother's home. That news came as a surprise to Jennifer Lasche because she was under the impression that since adoption by the Illinois couple was no longer an option, the children would be adopted by their current foster families.

Shortly afterwards, DCPP scheduled a meeting with the Lasches to discuss Foster Child 1's best interests. During the call to schedule the meeting, Epperly previewed her concern that the Lasches influenced Foster Child 1 and Foster Child 2 with their views on same-sex relationships. The meeting on June 29, 2018, at the Monmouth County DCPP office involved several people: the Lasches, their attorney, four DCPP employees (Kyle Higgins, Katie Epperly, Mary Lippencot, and Janelle Clark), one or two additional DCPP representatives, and an attorney for the State of New Jersey.

The central topic of the meeting was the Lasches' religious beliefs about the sinfulness of homosexual conduct. The DCPP employees expressed concern about the Lasches' belief that homosexual conduct was a sin, and they agreed that the Lasches' religious beliefs were a problem. They also sought assurance from the Lasches that they would not reject Foster Child 1 if she ever decided to explore her sexuality. One DCPP

5

representative remarked that Foster Child 1 would need therapy to deal with her belief that homosexual conduct is a sin.

A few days later, the Lasches again received surprising news. On July 2, 2018, without providing the Lasches with the statutorily required notice,[1] DCPP representatives went to family court and sought the removal of Foster Child 1 from the Lasches' custody. Foster Child 1's law guardian – an attorney appointed to provide legal representation to children in family court on matters involving allegations of abuse and neglect, or the potential termination of parental rights[2] – attended the hearing and objected to the removal of Foster Child 1 from the Lasches' home. The next day, however, Foster Child 1 was removed and placed in the same home as Foster Child 2.

Three months later, the Lasches learned something else that they should have known earlier. During the annual inspection for foster-parent license renewal, they discovered that DCPP had suspended their license without notice or explanation.

## II.    PROCEDURAL HISTORY AND JURISDICTIONAL ANALYSIS

In November 2018, the Lasches filed suit in New Jersey state court for violations of federal and state law. The Lasches brought federal claims under § 1983 and § 1985(3) for violations of their free exercise, due process, and equal protection rights. *See* 42 U.S.C. §§ 1983, 1985(3). They also brought state law claims under the New Jersey Law Against Discrimination ('LAD') and the New Jersey Civil Rights Act. The

---

[1] *See* N.J. Stat. Ann. § 30:4C-12.2; *id.* § 30:4C-61.2(b)(7).

[2] *See* New Jersey Office of the Public Defender, *Structure: Office of Law Guardian (OLG)*, https://www.state.nj.us/defender/structure/olg/ (last visited February 8, 2022).

6

defendants – the State of New Jersey, the DCPP, and four DCPP employees (Kyle Higgins, Katie Epperly, Mary Lippencot, and Janelle Clark)[3] – removed the case to the District Court based on federal-question jurisdiction. 28 U.S.C. § 1441(a); *see also* 28 U.S.C. § 1331; 28 U.S.C. § 1367(a).

The defendants filed a motion to dismiss the Lasches' complaint. In granting that motion, the District Court dismissed all of the Lasches' state-law claims with prejudice. It also dismissed with prejudice several of the Lasches' federal claims, specifically those against the State, the DCPP, and the DCPP-employee defendants in their official capacities, as well as the entirety of the § 1983 and § 1985(3) claims premised on a due process violation. In dismissing the remaining claims without prejudice, the District Court permitted the Lasches thirty days to amend their complaint.

The Lasches filed an amended complaint within that time. The individual-capacity defendants filed a motion to dismiss that challenged the sufficiency of the allegations in the amended complaint and asserted a qualified-immunity defense. The District Court determined that the allegations in the amended complaint were insufficient and granted the motion without addressing qualified immunity. Its order of dismissal allowed the Lasches another thirty days to file a motion to amend the complaint but only with respect to their § 1983 claim for violations of the First Amendment. If the Lasches did not so move, the order directed closure of the case.

---

[3] The complaint also listed ten 'Doe' defendants, but to date those defendants have not been identified or served.

7

The Lasches did not file a motion to amend that claim; instead, within nineteen days of the order, they appealed. Had they also filed a motion to amend their complaint within the thirty-day window, then the District Court's order would not have been a final appealable order. But under this Circuit's stand-on-the-complaint rule, *see Weber v. McGrogan*, 939 F.3d 232, 239–41 (3d Cir. 2019), by not also moving to amend, they fall within this Court's appellate jurisdiction over final orders, *see Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 n.5 (3d Cir. 1992); *see also* 28 U.S.C. § 1291.

### III. DISCUSSION

The plausibility of claims challenged at the motion-to-dismiss stage is analyzed through a three-step process. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The first step is the articulation of the elements of the claim. *See id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). The second step involves reviewing the complaint to disregard any "'formulaic recitation[s] of the elements of a . . . claim' or other legal conclusion," *id.* at 789 (alteration in original) (quoting *Iqbal*, 556 U.S. at 681), as well as allegations that are "so threadbare or speculative that they fail to cross the line between the conclusory and the factual," *id.* at 790 (citation omitted). The third step evaluates the plausibility of the remaining allegations – after assuming their veracity, construing them in the light most favorable to the plaintiff, and drawing all reasonable inferences in the plaintiff's favor. *See id.* at 787, 790; *see also Iqbal*, 556 U.S. at 679; *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

If, after completing this process, the complaint alleges "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the necessary elements of

8

a claim, then it plausibly pleads a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). But if "a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).

## A. First Amendment Retaliation

The District Court dismissed the Lasches' § 1983 claim against the individual-capacity defendants for First Amendment retaliation on two grounds. First, it concluded that, as a matter of law, foster parents sharing religious views with their foster children was not constitutionally protected conduct. Second, it determined that the complaint did not contain plausible allegations of a causal link between the Lasches' religious beliefs and the alleged retaliatory actions. The individual-capacity defendants defend that ruling on both grounds, and they also raise a qualified-immunity defense. Because the District Court erred in both of its conclusions, we will partially vacate its orders, leaving initial consideration of the qualified-immunity defense for the District Court on remand.

1. Articulation of the Elements. By its text, § 1983 allows civil suits for *deprivations* of federal rights. *See* 42 U.S.C. § 1983. Courts also permit § 1983 claims for *retaliation* in response to the exercise of constitutional rights, including First Amendment rights. *See, e.g.*, *Mirabella v. Villard*, 853 F.3d 641, 648–49 (3d Cir. 2017). Such a retaliation claim has three elements:

(1)    constitutionally protected conduct;

(2)    retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and

9

(3)     a causal link between the constitutionally protected conduct and the retaliatory action.

*See id.* at 649.

2. Identification of Deficient Allegations.  Some allegations in the amended complaint do little more than parrot the elements of a First Amendment retaliation claim. *See* Am. Compl. ¶ 46 (App. 116) (alleging that "the individual defendants acted under color of state law"); *id.* ¶ 47 (App. 116) (alleging that they took "retaliatory action" against the Lasches because of their religious beliefs "in violation of the First Amendment"); *id.* ¶ 48 (App. 116) (alleging "retaliatory action" because of "a religious practice" that was "a violation of the First Amendment"); *id.* ¶ 49 (App. 116) (alleging "retaliatory action" based on the Lasches' speech "in violation of the First Amendment"). Those formulaic allegations receive no weight in the plausibility analysis.  *See Connelly*, 809 F.3d at 789–90.

3. Evaluation of the Remaining Allegations.  Even without crediting the deficient allegations, the Lasches state a plausible claim for First Amendment retaliation.

*a.*     ***Constitutionally Protected Conduct.***  Through the Free Exercise Clause, the First Amendment secures the "freedom to believe and [the] freedom to act." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  Consistent with that protection, the Lasches allege two forms of constitutionally protected activity – one involving religious belief, and the other, action inspired by religious belief.

With respect to belief, the Lasches identify their religious opposition to same-sex marriage as constitutionally protected.  That is correct: the Free Exercise Clause provides

10

an absolute right to hold religious beliefs. *See Cantwell*, 310 U.S. at 303; *see also Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990) (explaining that the Free Exercise Clause protects "the right to believe and profess whatever religious doctrine one desires").

The Lasches also allege a plausible claim of retaliation for sharing their views on same-sex marriage with Foster Child 1. The Supreme Court has invalidated governmental regulation of faith-inspired action that is not neutral and generally applicable. *See, e.g.*, *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1878–79 (2021) (holding that a city's non-discrimination policy was not generally applicable because it allowed for individualized, discretionary exemptions); *see also Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (explaining that state action based on "hostility to a religion or religious viewpoint" violates the state's obligation under the Free Exercise Clause to "proceed in a manner neutral toward" religion); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993). And here, the individual-capacity defendants do not identify a neutral, generally applicable basis for their treatment of the Lasches. Nor is such a reason apparent from the pleadings. For instance, the Lasches' actions do not conflict with the biological parents' rights because Foster Child 1's father's rights were terminated and her mother abandoned her parental rights. Thus, the Lasches plausibly allege that they engaged in constitutionally protected conduct by sharing their religious views on same-sex marriage with Foster Child 1. *See Obergefell v. Hodges*, 576 U.S. 644, 679 (2015) (emphasizing that the First Amendment ensures "that religions, and those who adhere to religious doctrines, may continue to

11

advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned").

  **b.**  ***Retaliatory Action.*** The Lasches also plausibly allege that the individual-capacity defendants acted to remove Foster Child 1 from their care and suspended their foster license.  Both of those actions would deter people "of ordinary firmness from exercising [their] constitutional rights," and for that reason they qualify as retaliatory. *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citation omitted).

  **c.**  ***Causation.*** To complete their claim, the Lasches must allege facts that their constitutionally protected activity was a "substantial or motivating factor" for the retaliatory actions.  *Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018) (citation omitted).  That may be demonstrated through "unusually suggestive temporal proximity" between the protected conduct and the retaliatory action, *Mirabella*, 853 F.3d at 652 (citation omitted), or through a "pattern of antagonism" coupled with suggestive timing, *Conard*, 902 F.3d at 184 (citation omitted).

  Here, the timing of the retaliatory actions would ordinarily suffice for causation. Within a month of the same-sex couple's decision not to adopt the foster children, the individual defendants failed to provide the statutorily required notice of a family court hearing, and they obtained a court order at that hearing to remove Foster Child 1 from the Lasches.  That timing is unusually suggestive.  The DCPP's decision to suspend the Lasches' foster parent license is further removed temporally.  But in light of the prior pattern of antagonism regarding the family court hearing and the removal of Foster Child 1, the timing of those events is still suggestive of retaliation.

The District Court determined that the Lasches' allegations of causation were implausible for a different reason. It concluded that the family court order of removal broke any chain of causation between the Lasches' protected activity and the individual-capacity defendants' allegedly retaliatory actions. That is only a partial defense because the court order was for the removal of Foster Child 1 – not for the suspension of the Lasches' foster license, and thus that component of the Lasches' claim survives the motion to dismiss.

But as to the removal of Foster Child 1, an intervening court order may interrupt a causal chain if the court was "provided with the appropriate facts." *Egervary v. Young*, 366 F.3d 238, 250 (3d Cir. 2004). And here, the Lasches allege only that they did not receive the statutorily required notice of the court hearing. They do not allege that the family court lacked the appropriate facts. Nor do they allege that the individual defendants misled the court as to the relevant facts. Without those allegations, the family court order interrupts the causal chain regarding the removal of Foster Child 1. Thus, the District Court did not err in dismissing the Lasches' First Amendment retaliation claim related to the removal of Foster Child 1.

**B. Equal Protection**

The Lasches also sue the individual defendants for allegedly violating their rights under the Equal Protection Clause. *See* U.S. Const. amend. XIV, § 1. Their allegations fall short of the plausibility standard.

1. Articulation of the Elements. This Circuit recognizes several varieties of equal protection claims. *See PG Publ'g Co. v. Aichele*, 705 F.3d 91, 114–16 (3d Cir. 2013)

13

(articulating the class-of-one theory, the selective-enforcement theory, and the inconsistent-application theory).  Here, the Lasches pursue only a class-of-one theory.  *See id.* at 114–15.  A class-of-one claim that does not involve discrimination based on a protected characteristic has three elements:

(1)     differential treatment from those similarly situated;
(2)     done intentionally; and
(3)     without rational basis for the difference.

*See Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).

2.  Identification of Deficient Allegations.  Two of the Lasches' allegations should be disregarded.  First, their allegation of similarly situated persons is conclusory.  *See* Am. Compl. ¶ 52 (App. 117) (stating that the individual defendants "discriminated against [the Lasches] on the basis of their religious beliefs and treated them differently than similarly situated people who do not hold those religious beliefs").  Second, in a formulaic and conclusory manner, they allege that the individual defendants "violat[ed]" their equal protection rights.  *Id.* ¶ 53 (App. 117).  Due to these deficiencies, neither of these allegations can be considered in evaluating the plausibility of the equal protection claim.  *See Twombly*, 550 U.S. at 555; *Connelly*, 809 F.3d at 789–90 (explaining that conclusory allegations are not entitled to a presumption of truth and excluding them on that basis); *Fowler*, 578 F.3d at 210 (explaining that *Iqbal* instructed courts that "all civil complaints must contain 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation'" (quoting *Iqbal*, 556 U.S. at 678)).

14

3.  Evaluation of the Remaining Allegations.  With those allegations disregarded, the Lasches do not plausibly allege the first element of a class-of-one claim – differential treatment from those similarly situated.  At most, they state that despite personally knowing many foster parents over a ten-year period, they never heard of DCPP questioning other foster parents about their religious beliefs or removing foster children due to the foster parents' religious beliefs.  Yet, in the equal protection context, persons are similarly situated "when they are alike 'in all relevant aspects.'"  *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).  The Lasches' allegation does not meet that requirement.  They allege commonality at a very general level (status as foster parents), and their statement is based on a small sample size of a large group (the foster parents that they personally know).  Also, they offer nothing in the way of the most relevant comparators: DCPP's treatment of foster parents in the context of a proposed adoption by a same-sex couple, and DCPP's treatment of foster parents holding a belief that homosexual conduct is sinful.  For these reasons, the Lasches do not plausibly allege a class-of-one equal protection violation.

To avoid that outcome, the Lasches seem to argue for relaxing the plausibility standard in this context to permit consideration of some degree of reasonable speculation. They explain that the confidential nature of DCPP's work impedes them from finding examples of its treatment of other foster parents.  Without access to that information, the Lasches submit that there must have been hundreds of foster parents who were alike in all relevant respects except for a belief that homosexual conduct is a sin and that DCPP permitted those foster parents to adopt a foster child or did not suspend those foster

15

parents' license. But a party cannot demonstrate plausibility through speculation. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief *above the speculative level*[.]" (emphasis added) (citation omitted)); *Connelly*, 809 F.3d at 790 (explaining that "threadbare or speculative" allegations receive no weight in the plausibility analysis (quotation omitted)). Thus, the Lasches' efforts do not salvage the plausibly of their class-of-one equal protection claim.

**C. Conspiracy under 42 U.S.C § 1985(3)**

The Lasches also sue the individual-capacity defendants for conspiracy under 42 U.S.C. § 1985(3), premised on violations of their free exercise and equal protection rights. They plausibly allege a § 1985(3) conspiracy claim for a violation of their free exercise rights, but not for an equal protection violation.

1. Articulation of the Elements. As part of the Civil Rights Act of 1871, and later codified at § 1985(3), Congress created a private cause of action for damages against persons who conspire to violate federal rights. *See Griffin v. Breckenridge*, 403 U.S. 88, 98–99 (1971). That cause of action has four elements:

(1)    a conspiracy between two or more persons;

(2)    for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;

(3)    an act in furtherance of the object of the conspiracy;

(4)    that either injures a person's person or property or deprives a person of a right or privilege of a citizen of the United States.

*See* 42 U.S.C. § 1985(3); *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29 (1983); *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (quotation

16

omitted).  In construing the purposeful mental-state requirement in the second element, the Supreme Court explained that "there must be some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action."  *Griffin*, 403 U.S. at 102.  And the class must be linked by "the characteristic that formed the basis of the targeting[.]"  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273 n.4 (1993); *see also Farber*, 440 F.3d at 136 (explaining that the conspired-against group must have "an identifiable existence independent of the fact that its members are victims").

2.  Identification of Deficient Allegations.  The complaint recites in a formulaic fashion the mental-state element for the conspiracy.  *See* Am. Compl. ¶ 57 (App. 118) ("The individual Defendants conspired for the purpose of depriving Plaintiffs either directly or indirectly, [of] the equal protection of the laws, their First Amendment Rights and / or of the equal privileges and immunities under the laws.").  That statement, therefore, receives no consideration in evaluating the plausibility of the Lasches' § 1985(3) claim.

3.  Evaluation of the Remaining Allegations.  Because the Lasches do not plausibly allege an equal protection claim or a retaliation claim related to the removal of Foster Child 1, a violation of those rights cannot form the basis of a § 1985(3) claim.  *See Dondero v. Lower Milford Twp.*, 5 F.4th 355, 362 n.1 (3d Cir. 2021) (noting that conspiracy is only actionable under § 1983 when there is a "legal harm" (citations omitted)).  But the Lasches also premise their § 1985(3) claim on an alleged conspiracy

17

against them due to the exercise of their religious beliefs that resulted in the suspension of their foster license.

Even without the disregarded allegations, the Lasches plausibly allege such a claim. They identify a conspiracy (the first element of a § 1985(3) claim) by alleging that the individual-capacity defendants met together and told the Lasches that their "religious beliefs were a problem." Am. Compl. ¶ 55 (App. 118); *see also id.* ¶ 34 (App. 113–14) (expressing concern at the meeting with the Lasches' religious belief "that homosexuality [i]s a sin"). Those same allegations suffice for the mental-state requirement (the second element) since they support the inference that the Lasches' religious belief against same-sex marriage was the characteristic that motivated the conspirators to invidiously discriminate against them. *See Fulton*, 141 S. Ct. at 1877 (explaining that the government violates the Free Exercise Clause when it "proceeds in a manner intolerant of religious beliefs" (citing *Masterpiece Cakeshop*, 138 S. Ct. at 1730–32)). The Lasches also allege an act in furtherance of the conspiracy (the third element): despite a statutory obligation to do so, *see* N.J. Stat. Ann. § 30:4C-12.2; *id.* § 30:4C-61.2(b)(7), the individual defendants did not notify the Lasches of the court hearing regarding the removal of Foster Child 1 from their custody. The burdening of the Lasches' right to exercise their religious beliefs suffices for an injury (the fourth element). *See Griffin*, 403 U.S. at 103. Thus, the Lasches allege a plausible conspiracy claim under § 1985(3) with respect to the suspension of their foster license.

**D. New Jersey Law Against Discrimination**

The Lasches also sued four DCPP employees under New Jersey's LAD for religious discrimination in a place of public accommodation. *See* N.J. Stat. Ann. § 10:5-13(a)(2) (authorizing civil suits by persons aggrieved by unlawful discrimination); *see also* § 10:5-4 (declaring as a civil right "the opportunity to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . creed"); *id.* § 10:5-12(f)(1) (making unlawful discrimination by employees of a "place of public accommodation"). Normally, it is appropriate to engage in the three-step plausibility analysis. *See Connelly*, 809 F.3d at 787. But for this claim, the full treatment is unnecessary since the challenge turns on a single legal issue – the meaning of the term 'place of public accommodation.'

The District Court rejected the Lasches' LAD claim by reasoning that DCPP as an entity is not a place of public accommodation. As an ordinary interpretation of statutory text, that conclusion appears reasonable: the premises of the DCPP may be *places* of public accommodation, but that does not mean that DCPP's entire operations would also constitute such a place. That is consistent with the text of the LAD, which includes an extensive, but non-exhaustive list of places of public accommodation that does not specifically include governmental entities like the DCPP.[4] Yet when a federal court

---

[4] *See* N.J. Stat. Ann. § 10:5-5(l) (defining the term "place of public accommodation" to include, but not be limited to, the following: "any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation, or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession

19

exercises supplemental jurisdiction over a state-law claim, it must decide substantive issues as the forum state's supreme court "would rule if it were deciding [the] case." *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91–92 (3d Cir. 2008); *see also Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008). And the New Jersey Supreme Court has, at the direction of the New Jersey Legislature, construed the term 'place of public accommodation' liberally so that it is not "a fixed location." *Dale v. Boy Scouts of Am.* 734 A.2d 1196, 1208–09 (N.J. 1999), *rev'd on other grounds*, 530 U.S. 640 (2000). In fact, the New Jersey Supreme Court has concluded that a place of public accommodation can be "a moving situs." *Id.* at 1210 (citation omitted); *see also id.* at 1218 (concluding that the Boy Scouts are a place of public accommodation). And it has emphasized the breadth of the term 'place of public accommodation' and made clear that the LAD applies to New Jersey governmental entities: "New Jersey governmental entities are, of course, bound by the LAD." *Id.* at 1212 n.7. Since then, New Jersey's intermediate appellate court has on two occasions held that government agencies are places of public

---

dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water or in the air or any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic, or hospital; any public library; and any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education or the Commissioner of Education of the State of New Jersey.").

accommodation. *See Thomas v. Cnty. of Camden*, 902 A.2d 327, 332, 334 (N.J. Super. Ct. App. Div. 2006); *Ptaszynski v. Uwaneme*, 853 A.2d 288, 297 (N.J. Super. Ct. App. Div. 2004). Thus, despite cogent textual arguments to the contrary, it is likely that the New Jersey Supreme Court would interpret the LAD so that the DCPP – as an entity, not merely its premises – qualifies as a place of public accommodation. With that understanding, the Lasches' LAD claim against the individual-capacity defendants, who are DCPP employees, cannot be dismissed on the basis that DCPP is not a place of public accommodation.

* * *

For these reasons, we affirm in part and vacate in part. The remaining claims against the individual-capacity defendants – those under § 1983 and § 1985(3) premised on First Amendment retaliation as well as the LAD claim – are remanded.