PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1656
_____

MICHAEL LUTZ, individually and on behalf of all others
similarly situated,
Appellant

v.

PORTFOLIO RECOVERY ASSOCIATES, LLC
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2:20-cv-00676)
District Judge:  Honorable Christy C. Wiegand
_____

Argued:  May 4, 2022

Before:  GREENAWAY, JR., KRAUSE, and PHIPPS,
*Circuit Judges*.

(Filed:  September 19, 2022)
_____


Kevin J. Abramowicz        [ARGUED]
Kevin W. Tucker

EAST END TRIAL GROUP
6901 Lynn Way
Suite 215
Pittsburgh, PA 15208
        *Counsel for Michael Lutz*


Tammy L. Adkins            [ARGUED]
Amy Gilbert
David L. Hartsell
MCGUIREWOODS
77 West Wacker Drive
Suite 4100
Chicago, IL 60601

Jarrod D. Shaw
MCGUIREWOODS
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
        *Counsel for Portfolio Recovery Associates, LLC*


Stefanie Hamilton
Carlton M. Smith
COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF BANKING AND SECURITIES
17 North Second Street
Suite 1300
Harrisburg, PA 17101
        *Counsel for Amicus Curiae*

―――――――――――――――

## OPINION OF THE COURT

―――――――――――――――

PHIPPS, *Circuit Judge*.

In this case, a consumer, who seeks to represent a putative class, sues a debt collection firm for attempting to collect an outstanding credit-card debt, which had accrued interest at an annual rate of 22.90%. After the consumer had not paid the balance for several months, the bank canceled the card, ceased charging interest, closed the account, and sold it to the debt-collection firm. The firm did not charge interest on the account balance after purchasing it, but the firm did attempt to collect the outstanding balance inclusive of the previously accrued interest.

In his amended complaint, the consumer claimed that the debt collection firm violated the Fair Debt Collection Practices Act by making false statements about the amount of the debt, *see* 15 U.S.C. § 1692e, and by collecting a debt not permitted by law, *see id.* § 1692f. Both of those claims rest on the premise that a Pennsylvania statute prohibits the debt collection firm from collecting the interest that had previously accrued at an annual rate greater than 6%. *See* 7 P.S. § 6203.A; *see also* 41 P.S. § 201(a).

The debt collection firm moved to dismiss those claims and the others brought by the consumer, all for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The District Court granted that motion and did not

afford the consumer another opportunity to amend the complaint.

Through a timely appeal, the consumer argues that the District Court erred in dismissing the FDCPA claims and that the District Court should have permitted him an opportunity to amend his complaint again. But the consumer does not plausibly allege that Pennsylvania law prohibited the debt collection firm from collecting interest that had previously accrued at greater than 6% annually. Thus, as elaborated below, on *de novo* review of the motion to dismiss[1] and abuse-of-discretion review of the denial of the motion to amend the pleadings,[2] we will affirm the judgment of the District Court.

## I. FACTUAL BACKGROUND
### (AS ALLEGED IN THE COMPLAINT)

In July 2014, Michael Lutz received a credit card from Capital One Bank (USA), N.A. The card provided him with a revolving line of credit with which he could make purchases and obtain cash advances. For several months, Lutz made purchases and obtained cash advances with the card for

---

[1] *See Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (applying *de novo* review to a motion to dismiss under Rule 12(b)(6)); *see also Delaware Cnty. v. Fed. Hous. Fin. Agency*, 747 F.3d 215, 220 (3d Cir. 2014) (applying *de novo* review to questions of statutory interpretation).

[2] *See Walker v. Coffey*, 905 F.3d 138, 143 (3d Cir. 2018) (applying abuse-of-discretion review to a denial of leave to amend); *cf. U.S. ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 849 (3d Cir. 2014) (reviewing a determination of the futility of amendment *de novo*).

4

personal, family, and household purposes. Lutz had an obligation to repay Capital One for those purchases and cash advances. By the terms of the credit card agreement, he could do so over time through minimum installment payments. That agreement also permitted Capital One to charge interest at an annual rate up to 22.90% on any unpaid monthly balance.

Lutz failed to make the required monthly installment payments, and Capital One charged interest on the outstanding monthly balance. By July 2015, his account balance was $2,343.76, inclusive of at least $341.67 in interest that had accrued at an annual rate of 22.90%. At that time, Capital One charged off the account: it canceled the card, ceased charging interest, closed the account, and regarded the outstanding balance as a loss.

Capital One sold the charged-off account to Portfolio Recovery Associates, LLC ('PRA'). PRA is not a bank and cannot issue credit cards, but it does hold a license from the Pennsylvania Department of Banking and Securities to make motor vehicle loans and to charge interest at 18% to 21% on those loans. Despite that license, PRA's sole business involves purchasing defaulted consumer debt at a discount and then attempting to collect the full amount due.

As part of its collection efforts, PRA sued Lutz in a Magisterial District Court in Allegheny County, Pennsylvania in August 2019 for the outstanding account balance. PRA obtained a default judgment against Lutz. But Lutz timely appealed to the Allegheny County Court of Common Pleas, and before a hearing in that case occurred, PRA discontinued the lawsuit.

5

## II. PROCEDURAL HISTORY

In his original complaint, Lutz sued PRA in the District Court for the Western District of Pennsylvania for violating two provisions of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e, 1692f. *See* 28 U.S.C. § 1331 (conferring federal jurisdiction over "all civil actions arising under" the laws of the United States). Lutz based his FDCPA claims on an alleged underlying violation of Pennsylvania's Consumer Credit Code. *See* 12 Pa. Cons. Stat. § 6309. Instead of answering the complaint, PRA moved to dismiss it for failure to state a claim upon which relief could be granted. *See* Fed. R. Civ. P. 12(b)(6). Rather than opposing PRA's motion, Lutz amended his complaint. *See* Fed R. Civ. P. 15(a)(1) (allowing a party to amend a pleading once as a matter of course within 21 days after service of a Rule 12(b)(6) motion to dismiss).

The amended complaint did more than just attempt to cure the purported pleading deficiencies. It added additional FDCPA claims also under §§ 1692e and 1692f, which were premised on PRA's alleged violations of Pennsylvania's Consumer Discount Company Act, commonly abbreviated as the 'CDCA.'

PRA moved to dismiss Lutz's amended complaint, again for failure to state a claim for relief. This time, Lutz opposed PRA's motion to dismiss, but as part of his opposition, Lutz requested an opportunity to amend his complaint if the District Court dismissed any or all of his claims.

The District Court granted PRA's motion and dismissed with prejudice Lutz's original claims as well as the claims

6

added in the amended complaint.  As part of that order, the District Court denied Lutz's request for leave to amend.

Lutz sought reconsideration of that order.  In briefing that issue, Lutz identified another alleged underlying violation of the CDCA by PRA that he had not previously raised.  The District Court rejected that attempt to present a new argument and denied his motion.

Through a timely appeal, Lutz invokes this Court's appellate jurisdiction.  *See* 28 U.S.C. § 1291; Fed. R. App. P. 4(a).  To supplement the briefing provided by the parties, the Pennsylvania Department of Banking and Securities responded to an invitation for an amicus filing on the issues raised in the appeal.[3]

## III. DISCUSSION

Under the plausibility pleading standard, this Circuit uses a three-step process to evaluate a motion to dismiss a complaint for failure to state a claim for relief.  *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220–21 (3d Cir. 2011); *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  The first step in that process requires an articulation of the elements of the claim.  *See Connelly*, 809 F.3d at 787 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)); *see also Santiago*, 629 F.3d at 130 (quoting *Iqbal*,

---

[3] The Court extends its gratitude to the Pennsylvania Department of Banking and Securities and to Deputy Chief Carlton Smith for responding to the Court's invitation for an amicus submission.

556 U.S. at 675). The second step involves reviewing the complaint and disregarding any "'formulaic recitation of the elements of a . . . claim' or other legal conclusion," *Connelly*, 809 F.3d at 789 (alteration in original) (quoting *Iqbal*, 556 U.S. at 681); *see also Burtch*, 662 F.3d at 224; *Santiago*, 629 F.3d at 131, as well as allegations that are "so threadbare or speculative that they fail to cross the line between the conclusory and the factual," *Connelly*, 809 F.3d at 790 (citation omitted); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). The third step evaluates the plausibility of the remaining allegations. That involves assuming their veracity, construing them in the light most favorable to the plaintiff, and drawing all reasonable inferences in the plaintiff's favor. *See Connelly*, 809 F.3d at 787, 790; *see also Iqbal*, 556 U.S. at 679; *Fowler*, 578 F.3d at 210–11.

If, after completing this process, the complaint alleges "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the necessary elements of a claim, then it plausibly pleads a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). But if "a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). In the latter scenario, a district court should generally "permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

Following those three steps here on *de novo* review, the District Court's judgment dismissing Lutz's FDCPA claims should be affirmed.

8

## A. The Elements of an FDCPA Claim (Only One of Which Is Disputed)

In this Circuit, a claim under the FDCPA has four elements. *See Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014). The first three involve statutorily defined terms: the plaintiff must be a "consumer," 15 U.S.C. § 1692a(3); the defendant must be a "debt collector," *id.* § 1692a(6); and the challenged practice must relate to the collection of a "debt," *id.* § 1692a(5). *See Douglass*, 765 F.3d at 303; *see also Zimmerman v HBO Affiliate Grp.*, 834 F.2d 1163, 1167 (3d Cir. 1987) ("A threshold requirement for application of the FDCPA is that the prohibited practices are used in an attempt to collect a 'debt[.]'"). The fourth element, the one contested here, requires the defendant to have violated "the FDCPA in attempting to collect the debt." *Douglass*, 765 F.3d at 303.

For that fourth element, Lutz asserts that PRA violated two provisions of the FDCPA in attempting to collect his account balance: § 1692e and § 1692f. Section 1692e imposes civil liability for the use of false, deceptive, or misleading representations, subject to a bona fide error exception. *See* 15 U.S.C. § 1692e; *see also id.* § 1692k(c). That extends to false representations relating to "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A). Section 1692f outlaws unfair or unconscionable means of collecting debts. *See id.* § 1692f. That includes a prohibition on debt collectors from collecting:

> any amount (including any interest, fee, charge,
> or expense incidental to the principal obligation)
> unless such amount is expressly authorized by

9

the agreement creating the debt or permitted by
law.

*Id.* § 1692f(1).

Both of Lutz's FDCPA claims hinge on the premise that
PRA violated Pennsylvania law by attempting to collect
interest that had previously accrued at greater than 6%
annually. For context, the Commonwealth has a long history,
dating back to colonial times, of outlawing annual interest rates
above 6%.[4] Even now, Pennsylvania generally prohibits
annual interest above 6% on loans or the use of money of
$50,000 or less. *See* 41 P.S. § 201(a). But, during the Great
Depression, the Pennsylvania Department of Banking and
Securities, despite acknowledging the problem of usury,
recommended that credit be extended more readily to
consumers.[5] In response, the Pennsylvania legislature enacted

---

[4] *See, e.g.*, Act of 2d March, 1723 (2d vol. chap. 262, § 1)
("[N]o person shall, directly nor indirectly . . . take for the loan
or use of money, or any other commodities, above the value of
six pounds for the forbearance of one hundred pounds, or the
value thereof, for one year[.]"); Act of 28 May 1858 § 1, P.L.
No. 557 ("[T]he lawful rate of interest for the loan or use of
money, in all cases where no express contract shall have been
made for a less rate, shall be six per cent. per annum."). *But
see, e.g.*, Small Loans Act of June 17, 1915 § 1, P.L. No. 432
(capping the interest rate between 2–3% for loans of $300 or
less made by licensed small loan companies).

[5] *See* Commonwealth of Pa. Dep't of Banking, Report on Small
Loan Companies, at 5, 26 (Feb. 9, 1937),
https://hdl.handle.net/2027/mdp.39015076020364 (last visited
August 22, 2022) (recognizing that "[v]olumes have been
written in condemnation and in defense of the taking of
interest" and that "[t]he problem is as old as history of

the Consumer Discount Company Act, which permits entities licensed by the Pennsylvania Department of Banking and Securities to charge interest at a higher annual rate, up to 24%, for loans under a certain amount, currently $25,000. *See* 7 P.S. §§ 6203.A, 6213.E, 6217.1.A; *see also Cash Am. Net of Nev., LLC v. Dep't of Banking*, 8 A.3d 282, 285–86 (Pa. 2010). But the CDCA imposed restrictions on unlicensed entities "in the business of negotiating or making loans or advances of money on credit, in the amount or value of twenty-five-thousand dollars ($25,000) or less." 7 P.S. § 6203.A.[6] Those unlicensed entities may not "charge, *collect*, contract for[,] or receive interest" at an annual interest rate above 6%. *Id.* (emphasis added); *see also* 41 P.S. § 201(a).

Lutz's theory of PRA's liability under the FDCPA depends on PRA being subject to those restrictions in the CDCA. On the premise that PRA is an unlicensed entity subject to the CDCA, Lutz contends that it was illegal for PRA to attempt to

---

mankind," but nonetheless, "wisdom and common sense demand that every effort be made to support and enlarge the general purchasing power of the consumer to prevent underconsumption from retarding recovery").

[6] In an invited amicus filing, the Pennsylvania Department of Banking and Securities submits that this provision contains a scrivener's error added during the 1963 amendments which inadvertently changed "advances of money *or* credit" to "advances of money *on* credit." *Compare* Act of April 8, 1937, P.L. 262, No. 66, § 3 (emphasis added), *with* 7 P.S. § 6203.A (emphasis added). *See* Dep't of Banking & Securities Amicus Ltr. at 2 n.1 (Feb. 15, 2022) (ECF No. 47); *see also* Dep't of Banking Interpretive Ltr. at 4 (Nov. 19, 2001) (JA45). That issue of Pennsylvania law does not require resolution in this case.

*collect* interest that previously accrued on Lutz's account at greater than 6% – even though Capital One, as a bank not subject to the CDCA, *see* 7 P.S. § 6217, could legally charge that rate. With that alleged violation of the CDCA as a foundation, Lutz claims that PRA violated the FDCPA by making false statements about the amount of the debt, *see* 15 U.S.C. § 1692e, and by collecting a debt not permitted by law, *see id.* § 1692f.

In moving to dismiss Lutz's FDCPA claims, PRA denied that it was subject to the CDCA's restrictions on unlicensed entities on two grounds. First, PRA disputed the applicability of the CDCA's restrictions because it is not "in the business of negotiating or making loans or advances." 7 P.S. § 6203.A. Second, PRA argued that even if it were in the business of negotiating or making loans or advances, it could still collect interest at an annual rate above 6% because it held a license from the Department of Banking and Securities, albeit one for motor vehicle loans under the Consumer Credit Code, 12 Pa. Cons. Stat. § 6201, *et seq.*, not one issued under the CDCA. *See* 7 P.S. § 6217 (exempting from the CDCA's licensing requirements any company "licensed by the Secretary of Banking of the Commonwealth of Pennsylvania under the provisions of any other statute"). The District Court granted PRA's motion, rejecting the first argument, but relying on the second. On appeal, Lutz argues that both rationales are deficient, and PRA urges affirmation of the District Court's order on both grounds.

As briefed, the first argument – whether PRA is 'in the business of negotiating or making loans or advances' – narrows a bit. No one contends that PRA is in the business of *making* loans or advances. With that focus, the keystone of Lutz's case

12

becomes his assertion that PRA is in the business of *negotiating* loans or advances and thus subject to the CDCA. If PRA is not in that business, then the CDCA does not apply here, and PRA would prevail regardless of the scope of its license under the Consumer Credit Code.

## B. Certain Allegations in the Amended Complaint Must Be Disregarded.

The second step of the plausibility analysis involves disregarding allegations in the complaint that are legal conclusions, speculative, or threadbare. *See Connelly*, 809 F.3d at 789; *see also Santiago*, 629 F.3d at 131; *Fowler*, 578 F.3d at 210–11. In evaluating whether PRA is in the business of negotiating loans or advances, only allegations bearing on that topic need to be scrutinized.

Even still, several allegations must be disregarded. For example, the statement that "PRA's collection of the interest and fees on [Lutz's account] was subject to the CDCA" is a legal conclusion. Am. Compl. ¶ 61 (JA31). *See Connelly*, 809 F.3d at 789–90. Seven other paragraphs include similar legal conclusions about the CDCA's applicability to PRA.[7]

---

[7] *See* Am. Compl. ¶ 69 (JA32) ("Since PRA does not have a CDCA license or any other license that specifically provides for charging or collecting interest and fees on direct loans or revolving lines of credit, PRA is limited to charging or collecting no more than six percent simple interest per year on direct loans or revolving lines of credit."), ¶ 71 (JA32) ("PRA did not have legal authority to collect or receive such interest and fees because PRA was not licensed under the CDCA and was not otherwise licensed to collect or receive such interest and fees in Pennsylvania."), ¶ 72 (JA32) ("By seeking to collect and receive interest and fees charged in excess of six

13

*See Connelly*, 809 F.3d at 789–90. Also, three statements merely paraphrase the CDCA's requirements.[8] *See id.* at 790

percent simple interest per year on the Account's cash advances, PRA falsely represented its ability to collect the full amount of the Account."), ¶ 73 (JA32) ("Additionally, by seeking to collect and receive such interest and fees, PRA sought to collect and receive interest and fees it had no legal authority to collect or receive."), ¶ 92 (JA34) ("PRA's attempt to collect and receive such interest and fees was unlawful, as PRA could not lawfully collect or receive such interest and fees."), ¶ 93 (JA34) ("PRA's attempt to collect and receive such interest and fees misrepresented PRA's ability to collect or receive such interest and fees."), ¶ 94 (JA35) ("By seeking to collect interest and fees charged on cash advance balances of credit card accounts at rates in excess of six percent simple interest per year, PRA sought to collect amounts it could not lawfully collect from Lutz or the class members.").

[8] *See id.* ¶ 20 (JA25) ("The CDCA applies to debt buyers that purchase and attempt to collect loans or advances of money or credit in amounts of $25,000 or less."), ¶ 21 (JA25) ("Debt buyers must obtain a CDCA license to charge, collect, contract for, or receive interest and fees that 'aggregate in excess of the interest . . . the [debt buyer] would otherwise be permitted by law to charge if not licensed under th[e CDCA].'" (alterations in original)), ¶ 24 (JA26) ("Debt buyers seeking to collect cash advances on credit card accounts must obtain a CDCA license if they seek to collect interest and fees in excess of six percent simple interest per year because this type of credit constitutes a loan or advance of money or credit under the CDCA."), ¶ 60 (JA31) ("The CDCA applies to entities in the business of issuing or purchasing loans or advances of money or credit in amounts of $25,000 or less when such entities attempt to charge, collect, contract for, or receive interest and fees 'in excess of the interest . . . the [entity] would otherwise be permitted by law to charge if not licensed under th[e CDCA].'" (alterations in original)).

(disregarding allegations that "paraphrase[d] in one way or another the pertinent statutory language or elements of the claims in question"). None of those allegations may be considered in assessing whether PRA is in the business of negotiating loans or advances.

**C. The Amended Complaint Lacks Plausible Allegations that PRA Is in the Business of Negotiating Loans or Advances.**

The third stage of the plausibility analysis evaluates whether the non-disregarded allegations in the complaint plausibly state a claim for relief. When, as here, a motion to dismiss challenges less than all elements of a claim, only the sufficiency of the allegations pertaining to the disputed elements require evaluation. The critical dispute here concerns whether PRA is in the business of negotiating loans or advances, and that depends on the meaning of the term 'negotiate.'

1. *As used in the CDCA, the term 'negotiate' is best understood to mean 'to bargain.'*

In enacting the CDCA in 1937, the Pennsylvania legislature did not define or incorporate a preexisting definition for the term 'negotiate.' *See* 7 P.S. § 6202 (defining terms used in the CDCA). Under Pennsylvania law, an undefined statutory term takes on its "common and approved usage." 1 Pa. Cons. Stat. § 1903; *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1374 (3d Cir. 1996) (stating that, under Pennsylvania law, any undefined word "must be construed according to the rules of grammar and according to the common and approved usage"); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A

15

fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). And following the principle that a statutory term has a fixed meaning over time,[9] dictionaries from the time of a statute's enactment illuminate an undefined term's common and approved meaning. *See Phila. Eagles Football Club, Inc. v. City of Philadelphia*, 823 A.2d 108, 127 n.31 (Pa. 2003); *see also Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070–71 (2018); *Delaware Cnty. v. Fed. Hous. Fin. Agency*, 747 F.3d 215, 221 (3d Cir. 2014).

Dictionaries contemporaneous with the CDCA's enactment identify two common and approved meanings of 'negotiate.' It could mean "to bargain,"[10] and it also could mean "to

---

[9] *See United States v. Jabateh*, 974 F.3d 281, 296 (3d Cir. 2020) (second alteration in original) ("[U]nder the fixed-meaning canon '[w]ords must be given the meaning they had when the text was adopted." (quoting Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 78 (2012))).

[10] *Negotiate*, Black's Law Dictionary (3d ed. 1933) (defining 'negotiate' as "To transact business, to treat with another respecting a purchase and sale, to hold intercourse, to bargain or trade, to conduct communication or conferences. It is that which passes between parties or their agents in the course of or incident to the making of a contract; it is also conversation in arranging terms of contract" and "To discuss or arrange a sale or bargain; to arrange the preliminaries of a business transaction"); *see also* Webster's New International Dictionary 1638 (2d ed.1934) (defining 'negotiation' as "a treating with another with a view to coming to terms, as for a sale or purchase").

16

transfer," especially with respect to a negotiable instrument.[11] When, as here, a term has multiple common and approved meanings, context may inform the term's meaning. *See United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 690 (9th Cir. 2006) ("As with most words, the dictionary gives multiple definitions. But we do not ascertain ordinary meaning in the abstract. Rather, we must decide which of these definitions, if any, is consistent with the context of the statute."); *see also* Scalia & Garner, at 70 (noting that "[m]any words have more than one ordinary meaning" and that "[o]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise").

One tool for evaluating context, the *noscitur a sociis* canon, instructs that neighboring words inform the meaning of a term.[12] Looking at nearby words in § 6203.A, the transitive

---

[11] *Negotiate*, Black's Law Dictionary (3d ed. 1933) ("An instrument is 'negotiated,' when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof."); Bouvier's Law Dictionary 843 (Baldwin's Century Ed. 1934) (defining 'negotiate' as "to conclude a contract or to transfer or arrange" and "The power to negotiate a bill or note is the power to indorse and deliver it to another, so that the right of action thereon shall pass to the indorser or holder. A note transferred by delivery is negotiated. A national bank, under the power to negotiate evidences of debt, may exchange government bonds for registered bonds"); Webster's 1638 (defining 'negotiate' as "To transfer for a valuable consideration under rules of commercial law").

[12] *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 634–35 (2012) ("[T]he 'commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated.'" (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008))); *see also*

verb 'negotiate,' used as a gerund in a gerund phrase, is linked with another transitive verb 'make,' also a gerund in the same gerund phrase, and each has two direct objects: loans and advances.[13]  *See* 7 P.S. § 6203.A.  The direct objects show little preference for either meaning of 'negotiate' because loans and advances can be bargained for and transferred.  But the other verb, 'make,' applies to the initiation and formation of loans and advances.  *See Make*, Black's Law Dictionary (3d ed. 1933) (defining 'make' as "[t]o cause to exist").  And the pairing of 'negotiating' with 'making' in § 6203.A suggests that 'negotiate' should also relate to the initiation of loans or advances.  Since bargaining occurs at the loan initiation phase and transferring does not, 'negotiate' is better understood to mean 'bargain.'  That conclusion is not automatic, however, because the terms 'negotiating' and 'making' are separated by an 'or,' and that may mean that they are alternatives rather than complements of each other.[14]  But the term 'or' may also be used to identify two separate but related actions.[15]

---

*United States v. Taylor*, 142 S. Ct. 2015, 2023 (2022); *United States v. Yung*, 37 F.4th 70, 80 (3d Cir. 2022); *Mountain Vill. v. Bd. of Supervisors of Longswamp Twp.*, 874 A.2d 1, 8–9 (Pa. 2005) (quoting *Northway Vill. No. 3, Inc. v. Northway*, 244 A.2d 47, 50 (Pa. 1968)).

[13] *See generally* Sister Miriam Joseph, The Trivium: The Liberal Arts of Logic, Grammar, and Rhetoric 55–57 (Marguerite McGlinn ed., First Paul Dry Books 2002) (1937) (explaining that a "transitive verb expresses action that begins in the subject . . . and 'goes across' . . . to the object" and that a gerund "is a verbal which, like the infinitive, may perform all the functions of a substantive" ).

[14] *See Or*, Black's Law Dictionary (3d ed. 1933).

[15] *See id.*

18

Additional context resolves that uncertainty. In the subsequent subsection, the CDCA again uses the term 'negotiate' to define the scope of the CDCA's coverage. *See* 7 P.S. § 6203.B. That subsection extends the CDCA to "[a]ny person who shall hold himself out as willing or able to arrange for or *negotiate* such loans . . . or who solicits prospective borrowers of such loans." *Id.* (emphasis added). The related phrases in that subsection – 'arrange for' and 'solicits' – concern loan initiation and formation, and not the transferability of the debt. *See* Webster's New International Dictionary 152 (2d ed. 1934) (defining 'arrange'); *Solicit,* Black's Law Dictionary (3d ed. 1933). Thus, for purposes of that subsection, 'negotiate' is best understood to mean 'to bargain,' not 'to transfer.' Although not absolute,[16] the consistent-usage canon holds that a term should have the same meaning each time it is used throughout a statute.[17] And for 'negotiate' to have a consistent meaning in the CDCA, it must mean 'to bargain.'

---

[16] *See United States v. Adair*, 38 F.4th 341, 353 (3d Cir. 2022).

[17] *See Pereira v. Sessions*, 138 S. Ct. 2105, 2115 (2018) ("[I]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 571 (2012)); *see also United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring in part and concurring in the judgment) (invoking "the presumption of consistent usage – the rule of thumb that a term generally means the same thing each time it is used"); *Bayview Loan Servicing, LLC v. Lindsay*, 185 A.3d 307, 313 (Pa. 2018) (same).

19

In sum, as applied here, *noscitur a sociis* and the consistent usage canon counteract the other's limitations, and together they yield the conclusion that the term 'negotiate' as used in § 6203A means 'to bargain.'

2. *The remnant allegations in the complaint do not plausibly allege that PRA is in the business of negotiating loans or advances.*

Lutz does not specifically allege that PRA is in the business of negotiating – or bargaining for – loans or advances. The amended complaint contains two sets of allegations related to PRA's business practices. One paragraph describes PRA's business practice without a specific reference to negotiating loans: "PRA's sole business is purchasing defaulted consumer debt with the purpose of collecting debt for profit." Am. Compl. ¶ 9 (JA24). A later paragraph adds a layer of detail, but still makes no specific reference to PRA negotiating loans: "PRA is in the business of purchasing loans or advances of money or credit, as PRA purchases debt for the purpose of collecting debt for profit." *Id.* ¶ 63 (JA31). In addition, eight paragraphs in the amended complaint address Lutz's specific interactions with PRA – and none of those remotely suggest that PRA is in the business of negotiating loans. Those paragraphs allege that "PRA filed a lawsuit against Lutz," *id.* ¶ 38 (JA28), and that PRA "purchased [Lutz's] Account from Capital One Bank," *id.* ¶ 39 (JA28). They also state that "PRA sought to collect and receive interest and fees charged on the Account's purchases and cash advance balances," *id.* ¶ 40 (JA28), and that "[t]he interest and fees . . . [had been] charged at a rate that aggregated in excess of 22.90% per year," *id.* ¶ 41 (JA28). They further indicate that "PRA obtained a default judgment against Lutz," *id.* ¶ 42 (JA28), that Lutz appealed

20

that judgment, *id.* ¶ 43 (JA28), and that PRA discontinued the action before a hearing could be held in the appeal, *id.* ¶¶ 44–45 (JA28). In short, nowhere does Lutz allege that PRA is in the business of negotiating loans or advances.

Despite the absence of such allegations, Lutz's pleading receives the benefit of reasonable inferences at the motion-to-dismiss stage. *See Connelly*, 809 F.3d at 790; *see also Iqbal*, 556 U.S. at 678. Lutz's allegations indicate that PRA *purchases* debt, such as Lutz's credit card account that Capital One charged off. But even with that allegation as a starting point, it is not reasonable to infer that an entity that purchases charged-off debt would also be in the business of negotiating or bargaining for the initial terms of loans or advances. If anything, the amended complaint cuts against such an inference: it alleges that Capital One, not PRA, set the annual interest rate for Lutz's use of the credit card for loans and advances at 22.90%. Thus, with the understanding that negotiate means 'to bargain' and not 'to transfer,' Lutz's allegations do not support an inference that PRA is in the business of negotiating loans or advances.

Without such a favorable inference, Lutz cannot establish that PRA is subject to the CDCA and its limitations on collecting interest. And because his FDCPA claims depend on an underlying violation of the CDCA, they collapse.[18]

---

[18] For closure, PRA's collection of Lutz's account balance from Capital One, inclusive of the 22.90% annual interest rate, does not violate Pennsylvania's general usury statute, which prohibits annual interest at a rate over 6%. As a bank, Capital One was authorized to charge interest at a higher rate, and the general usury prohibition, unlike the CDCA, does not regulate collection – only the interest on a loan or use of money.

**D. The District Court Did Not Abuse Its Discretion in Denying Lutz Leave to Amend His Complaint Again.**

Lutz also argues that the District Court erred by dismissing his claims with prejudice and denying him leave to amend his complaint for a second time. He contends that through further amendment he could allege that PRA's license to charge interest on motor vehicle loans at an annual rate of up to 21% did not permit it to collect interest that Capital One charged. But amendments along those lines could be curative only if the CDCA applies to PRA. And as explained above, the allegations do not establish that PRA is in the business of negotiating loans or advances, and therefore the amended complaint fails to place PRA within the CDCA's regulatory grasp. Because the proposed amendments do not cure those deficient allegations, the amendments would be futile, and the District Court did not abuse its discretion in dismissing Lutz's claims with prejudice and denying Lutz leave to amend. *See Mullin v. Balicki*, 875 F.3d 140, 150 (3d Cir. 2017).

---

*Compare* 7 P.S. § 6203.A (prohibiting unlicensed covered entities from "charg[ing], *collect[ing]*, contract[ing] for or receiv[ing] interest") (emphasis added), *with* 41 P.S. § 201(a) (setting "the maximum lawful interest rate for the *loan* or *use of money*") (emphasis added). *See also Roethlein v. Portnoff Law Assocs., Ltd.*, 81 A.3d 816, 821–24 (Pa. 2013) ("[T]he plain language of [the general usury statute] restricts its application to claims involving the loan or use of money."); *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 394–97 (3d Cir. 2000) (concluding that the general usury statute's application is limited to "the loan or use of money").

## IV. CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment.

## Lutz v. Portfolio Recovery Associates, LLC

### No. 21-1656

KRAUSE, *Circuit Judge*, concurring.

I join my colleagues' excellent opinion in full but write separately to address two additional issues that were raised by the parties and that have benefited from the Secretary of Banking's thoughtful and illuminating analysis as amicus.

First is the type of license that permits an entity under Pennsylvania's Consumer Discount Company Act ("CDCA") to charge in excess of 6% on loans under $25,000, notwithstanding the statute's general prohibition. *See* 7 P.S. §§ 6203, 6217. As the District Court interpreted the statute, it authorizes the charging of excess interest not just by entities licensed under the CDCA, but by any entity to which the Secretary of Banking has issued a license to do business under any statute. Because Portfolio Recovery Associates ("PRA") fell into that category, the District Court viewed its collection of excess interest as permissible, ruling out a Fair Debt Collections Practices Act ("FDCPA") claim predicated on a CDCA violation. According to Lutz and the Secretary of Banking, however, the District Court misinterpreted the statute, and for the reasons explained below, I believe they are correct.

Second, I consider whether—if Lutz cannot base his FDCPA claim on a CDCA violation—he can base it instead on PRA's alleged violation of Pennsylvania's Loan Interest and Protection Law ("LIPL"), 41 P.S. § 101, *et seq.* I join my colleagues in holding that he cannot because the LIPL does not regulate the "collection" of interest, and PRA is in the

collection business.  *See supra* n.18.  But there is a second, independent reason that the LIPL is inapplicable, which I also address below.

## I.     PRA's Consumer Credit Code License Does Not Confer the Authority to Charge Interest as a CDCA Licensee.

We begin with PRA's contention that we need not wade into the intricacies of what it means to "negotiate" loans or advances under the CDCA because, regardless, the fact that PRA holds a Consumer Credit Code license means that it is exempted from the CDCA's prohibition on collecting interest at a rate of more than 6%.[1]  As the theory goes, the CDCA bars any entity "engage[d] . . . in the business of negotiating or making loans or advances of money on credit" from charging over 6% interest on direct loans under $25,000 "if not licensed under this act."  7 P.S. § 6203.  But the CDCA does not apply to certain kinds of entities, including entities that are "licensed by the Secretary of Banking . . . under the provisions of any

---

[1] The Majority does not contend with the § 6217 issue, instead dispensing with Lutz's CDCA claim on the grounds that the CDCA does not apply to PRA because PRA does not "negotiate" loans within the meaning of the Act.  As I see it, there would be no need to construe "negotiate" if PRA's Consumer Credit Code (CCC) license—which is issued by the Secretary of Banking and permits PRA to collect on motor vehicle loans, *see* 12 PA. CONS. STAT. § 6201, *et seq.*,—exempts it from the CDCA in any event.  So, I would consider this issue at the outset.  Regardless, however, we reach the same conclusion in the end.

2

other statute." 7 P.S. § 6217. *Ergo*, says PRA, it is exempted from the CDCA's general prohibition and can charge excess interest.

The problem for PRA, however, is that the plain language of the statute compels a different reading, which the Secretary, as amicus, corroborates, *i.e.*, that § 6217 merely permits an entity licensed by the Secretary under another statute to engage in the activities for which it is licensed without, in addition, obtaining a CDCA license—even when those activities would also fall within the CDCA's ambit.

We start with a textual analysis. As noted, the parties differ as to what it means that the CDCA does not "apply" to corporations licensed under a different statute. But we must "[a]ssum[e] that every word in a statute has meaning" and "avoid interpreting part of a statute so as to render another part superfluous." *Allen ex. rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 367 (3d Cir. 2011). Here, § 6203 of the CDCA provides that only CDCA licensees may collect over 6% interest on direct loans under $25,000. 7 P.S. § 6203. So if we were to conclude, as PRA would have us do, that § 6217 allows *any* licensee of the Secretary under any statute to collect over 6% interest, it would render § 6203 superfluous.

The broader context of § 6217 further supports Lutz's and amicus's interpretation. The first sentence announces that the CDCA "shall not affect any existing laws . . . authorizing a charge for the loan of money in excess of interest at the legal rate." 7 P.S. § 6217. As the Secretary of Banking points out, that is exactly what the provision at issue in this case does: It ensures that the CDCA does not interfere with the privileges conferred by other kinds of licenses issued by the Department even when they authorize activity that would otherwise require

3

a CDCA license. In other words, § 6217 provides that entities authorized under other laws to charge and collect interest on direct loans at a rate greater than that permitted by the CDCA (such as banks operating under the Banking Code or pawnbrokers licensed under the Pawnbrokers License Act, 63 P.S. § 281-1 *et seq.*) need not also obtain a CDCA license and comply with the CDCA's requirements. *See* Amicus Br. 3 ("As long as those licensees lawfully engage in the activities for which they are licensed, the CDCA will not apply to their conduct."). Similarly, entities authorized by other laws to charge fees not provided for by the CDCA, such as sales finance companies licensed under the CCC, are not prohibited by the CDCA from doing so. *Id.*

PRA's interpretation would also produce just the sort of absurdity that Pennsylvania's statutory rules of construction direct us to avoid. *See* 1 PA. CONS. STAT. § 1922(1)-(2). PRA, echoing the District Court, argues that its reading of § 6217 is consistent with the purpose of the CDCA, which it believes to be "concerned about *unregulated, unlicensed* entities—not entities licensed by the Secretary of Banking," because the Secretary "has oversight and other authority over [all of] its licensees, even those which are licensed under other statutes." Answering Br. 28, 32 (quoting Appx. 11-12). But the Secretary of Banking issues licenses to a wide variety of entities, including money transmitters, check cashers, debt management and debt settlement companies, pawnbrokers, mortgage brokers, lenders, servicers, loan correspondents or originators, and motor vehicle sales finance companies.[2] So

---

[2] *See* 7 P.S. § 6102 (money transmitters); 63 P.S. § 2311 (check cashers); 63 P.S. § 2403 (debt management and debt settlement companies); 63 P.S. § 281-3 (pawnbrokers); 7 PA.

4

under PRA's theory, the General Assembly would have authorized all these licensees—some of which engage in businesses far afield from lending—to charge, collect, contract for, and receive interest and other charges of over 6% per year on direct loans under $25,000. 7 P.S. § 6203. To put a fine point on it, it would mean that money transmitters and check cashers, among others, would be authorized to charge and collect interest in excess of the CDCA's 6% cap solely by virtue of the fact that they hold licenses to engage in their primary business. But "in ascertaining legislative intent, the Statutory Construction Act requires a presumption that the General Assembly did not intend a result that is absurd or unreasonable," *Cash Am. Net of Nev., LLC v. Dep't of Banking*, 8 A.3d 282, 289 (Pa. 2010) (citing 1 PA. CONS. STAT. § 1922(1)), so the CDCA should not be construed in that nonsensical manner.

Comparing the licensing regime for pawnbrokers to the licensing regime set forth in the CDCA reinforces our conclusion. *See* 1 PA. CONS. STAT. § 1932(b) (instructing courts to construe statutes relating to the same things together). On April 6, 1937, just two days before the passage of the CDCA, Pennsylvania Governor George H. Earle signed the

---

CONS. STAT. § 6111 (mortgage brokers, lenders, servicers, loan correspondents or originators); 12 PA. CONS. STAT. § 6211 (motor vehicle sales finance companies). Notably, the Department of Banking merged with the Pennsylvania Securities Commission in 2012, so the Department is now responsible for licensing "a broad range of entities and industries that were never contemplated by the General Assembly when the CDCA was enacted." Amicus Br. 4.

5

Pawnbrokers License Act into law. 63 P.S. § 281-1 (originally enacted as Act of April 6, 1937, P.L. 200, No. 51). It contained many provisions parallel to the original version of the CDCA, but included less stringent requirements for pawnbrokers. For example, both statutes required applicants to include a bond with their application for licensure: $2,000 for prospective Pawnbrokers License Act licensees and $5,000 for prospective CDCA licensees. These bond requirements remain in the same amounts to this day. *See* 63 P.S. § 281-5; 7 P.S. § 6205.

Similarly, the CDCA as enacted in 1937 required corporations to have a minimum capitalization of $25,000 in order to be eligible for a license; the Pawnbrokers License Act contained no minimum capitalization requirement. *See* Act of April 8, 1937, P.L. 262, No. 66, § 7; Act of April 6, 1937, P.L. 200, No. 51. Today, the minimum capitalization requirement for CDCA licensees is $75,000, and there is still no analogous requirement for licensed pawnbrokers. *See* 7 P.S. § 6207; 63 P.S. § 281-1 *et seq.*

The fact that the two statutes were passed contemporaneously demonstrates that the General Assembly made intentional choices as to which requirements would apply to consumer discount companies and which would apply to pawnbrokers. *See* 1 PA. CONS. STAT. § 1921(c)(7). If the General Assembly intended licensed pawnbrokers—who indisputably fall within the category of entities "licensed by the Secretary of Banking . . . under the provisions of any other statute," 7 P.S. § 6217—to enjoy the same privileges conferred by a CDCA license, there would have been no reason for it to have constructed an entirely different licensing regime. But it did, signaling that being a licensee under another statute does not equate to being licensed under the CDCA. And it does not

6

exempt such licensees, if they are covered by the CDCA, from the strictures of that statute.

Here, PRA's CCC license does not authorize it to charge over 6% interest on direct loans under $25,000, and for the reasons explained, the mere fact that it holds such a license does not exempt it from § 6203's general prohibition. The next question I would reach is whether PRA can avoid liability under that section by showing that it is not "in the business of negotiating or making loans or advances." 7 P.S. § 6203. Our majority opinion aptly addresses that issue with which I am in full agreement. *See supra* Section III.C. In sum, under neither of Lutz's theories of CDCA liability can his FDCPA claim rest on a violation of that statute.

## II.     PRA Also Did Not Violate the LIPL.

Nor has Lutz established a LIPL violation as a basis for his FDCPA claim. The LIPL caps at 6% "the maximum lawful rate of interest" for a loan of $50,000 or less, 41 P.S. § 201, with the proviso that if this rule is "inconsistent with the provision of any other act establishing, permitting or removing a maximum interest rate, or prohibiting the use of usury as a defense, the provision of such other act shall prevail," 41 P.S. § 604. The LIPL also exempts banks, which "may charge a maximum rate of interest as authorized by [the Banking Code] or other applicable Federal or State law," *id.*, so there is no question that Capital One, the originator of Lutz's credit card account, was in compliance with the LIPL when it charged interest at a rate of 22.9%. *See* 7 P.S. § 6217. The question remains, however, whether Capital One can validly assign its right to collect on that interest to a non-bank, like PRA, that itself *is* subject to the LIPL's interest cap.

7

Pennsylvania law answers in the affirmative. Section 2210 of Pennsylvania's Commercial Code provides that contract rights—including rights to collect debt and interest—are freely assignable, meaning that "the assignee stands in the same shoes as the assignor," *U.S. Steel Homes Credit Corp. v. S. Shore Dev. Corp.*, 419 A.2d 785, 789 (Pa. Super. Ct. 1980), and although "[a]n assignment does not confer on the assignee any greater rights than those possessed by the assignor . . . the assignee's rights are not inferior to those of the assignor," *id.* (citation omitted). But interpreting § 201 of the LIPL to abrogate an assignee's contractual right to collect debt with over 6% interest would render § 201 "inconsistent with" Pennsylvania's assignment statute. 41 P.S. § 604. So, under the LIPL's proviso, the assignment statute, 13 PA. CONS. STAT § 2210, "shall prevail." *Id.*

It is also telling that the LIPL, unlike some other Pennsylvania statutes, does not prohibit assignments. The CDCA, for example, explicitly provides that "a license may not be transferred or assigned," 7 P.S. § 6208, as does the CCC, which states that a debt arising from an installment sale contract for a motor vehicle is not enforceable if "the holder was not licensed under this chapter when the holder acquired the contract," 12 PA. CONS. STAT. § 6236(a)(2). There is no such restriction in the LIPL, which, to the contrary, indicates in the proviso that the LIPL will yield to "other acts"—presumably including the law of assignments, codified at 13 PA. CONS. STAT § 2210—if they would be inconsistent with the 6% cap. *See* 41 P.S. § 604. So as applied here, this means that because PRA acquired the charged-off account from Capital One, PRA had the same rights as Capital One to collect the total amount of both the debt and interest that accrued.

8

We draw support for our conclusion from our decision in *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379 (3d Cir. 2000), *abrogated on other grounds by Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017). Although that case dealt with assignment of government entities' claims against homeowners who failed to pay their property and utility taxes, rather than consumer debt originated by a bank, its reasoning carries over to this context. In *Pollice*, we cited a Pennsylvania Commonwealth Court decision holding that a provision of the Municipal Claims and Tax Liens Law permitted a municipality to assign or transfer any claim, tax or municipal, to a party that is a stranger to the original transaction. *Id.* at 389 (citation omitted). Because the statute provided that "such assignee[s] shall have all the rights of the original holder thereof," 53 P.S. § 7147, we found that the purchaser of the claims—a company in the business of purchasing such delinquent claims from municipalities in several states—had the authority to collect interest and penalties to the same extent as the government entities under relevant state and local law, including the authority to exceed the LIPL's six percent cap on interest rates, *Pollice*, 225 F.3d at 389-90, 392.

Our reading of the LIPL also aligns with the Seventh Circuit's interpretation of Illinois's usury statute, 815 Ill. Comp. Stat. § 205/5. In *Olvera v. Blitt & Gaines, P.C.*, the court considered whether Illinois's usury statute prohibits an unlicensed debt buyer from charging the same interest rate as the original lender where the lender was authorized by license or by its status as a bank to charge a higher interest rate. 431 F.3d 285, 286 (7th Cir. 2005). By its terms, § 205/5 forbids anyone from charging a higher interest rate "than is expressly authorized by this Act or other laws of this State." *Id.* at 287 (quoting § 205/5). The Seventh Circuit noted that "other laws

9

of this State" included the "law of assignments, whereby the assignee steps into the shoes of the assignor," and concluded that the usury statute did not prevent debt buyers from collecting interest at the higher rate. *Id.* at 288-89. Here, the same is true for the LIPL's proviso, which by its terms gives precedence to "other acts" like § 2210 that would "permit[] or remov[e] a maximum interest rate." 41 P.S. § 604.

Finally, a regulation issued by the Office of the Comptroller of the Currency after the events of this suit confirms the reasonableness of this interpretation and ensures that any confusion on this score is eliminated going forward. That regulation—12 C.F.R. § 7.4001(e)—provides: "[i]nterest on a loan that is permissible under 12 U.S.C. § 85 shall not be affected by the sale, assignment, or other transfer of the loan." Any contrary state law is preempted.[3] *See id.*; *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996) (establishing preemption for state regulation of national banks). And under 12 U.S.C. § 85, national banks like Capital One may charge interest on a loan in accordance with the law of the state where the bank is located, so their assignees can as well.

In sum, without either a LIPL or a CDCA violation on which to base his FDCPA claim, Lutz cannot survive a motion

---

[3] Opponents of the regulation have argued that the OCC lacked authority to preempt state usury law in the manner that it did. *See Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 85 Fed. Reg. 33,530 (June 2, 2020) (summarizing comments). We need not wade into this debate for our purposes.

to dismiss.  For these reasons, I join the Majority in affirming the judgment of the District Court.